# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1881V**
UNPUBLISHED

| | |
|---|---|
| CHRISTINE HARBISON,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 19, 2026 |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On December 16, 2020, Christine Harbison filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging a Table injury – Shoulder Injury Related to Vaccine Administration ("SIRVA") – as a result of her receipt of an influenza ("flu") vaccine on November 6, 2018. Petition, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, and after holding a brief hearing on damages in this matter, I find that Petitioner is entitled to compensation, and I award damages in the total amount of **$110,000.00, representing Petitioner's actual pain and suffering, and $660.56 representing Petitioner's unreimbursed expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

After the case's initiation and SPU assignment, Respondent filed a Rule 4 Report recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 33. Specifically, Respondent argued that the evidence preponderated against a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of her vaccination. *Id*. at 7-8. On June 10, 2024, I issued a ruling on entitlement finding that Petitioner established that the onset of her shoulder injury occurred within 48 hours, and had otherwise demonstrated all requirements to demonstrate a Table SIRVA and entitlement to compensation under the vaccine claim. ECF No. 39.

The parties engaged in informal discussions to resolve damages, but ultimately were unable to do so on their own. ECF No. 47. I therefore ordered the filing of written briefs and any other evidence, and later scheduled this matter for an expedited hearing and ruling. ECF No.48; ECF No. 56; Hearing Order (Non-PDF) filed September 11, 2026.

That hearing was held on September 25, 2026, and addressed an appropriate award of pain and suffering and unreimbursed expenses. Petitioner requests that I award her $180,000.00 for past pain and suffering, and $1,559.57 representing her unreimbursed expenses. ECF No. 51. Respondent proposes that I award the lesser amount of $30,000.00 for actual pain and suffering and unreimbursed expenses in the amount of $505.56. ECF No. 55. After hearing argument, I made a damages determination.[3] This Decision memorializes those findings.

## II. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Pello v. Sec'y of Health & Hum. Servs.,* No. 24-1896V, 2026 WL 2211341, at *1-3 (Fed. Cl. Spec. Mstr. July 14, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y*

---

[3] Additionally, the parties advised after the hearing (at my request), that they agree Petitioner's unreimbursed expenses through her first surgery are $660.56. Informal Communicated dated October 16, 2026.

*of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

## III. The Parties' Arguments

The primary damages dispute in this case centers around whether Petitioner's post-July 2019 shoulder treatment is related to her SIRVA.[5]

Petitioner argues all of her shoulder treatment following her November 2018 vaccination is related, including two surgeries. ECF No. 51 at 9. Pre-vaccination she had no left shoulder pain or dysfunction, and no prior findings of left shoulder abnormalities. *Id*. at 9. After her vaccination, she suffered the immediate onset and progression of shoulder symptoms. *Id*. at 9-10. Petitioner further argues her initial post vaccination MRI report from March 2019 did not including findings, or an impression, of osteoarthritis – while her July 2019 repeat MRI report did. *Id.* at 10-11. Accordingly, Petitioner argues the July MRI findings were new and that the rapid onset and worsening of these degenerative changes was due to chronic inflammation and mechanical dysfunction secondary to her vaccine injury – which she argues is supported by the medical literature – ultimately leading to her two separate shoulder surgeries. *Id*. at 11-12.

---

[4] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] This dispute stems, at least in part, from the following observation I made in a footnote of my Ruling on Entitlement in this claim:

> Respondent also remarks (in a footnote of his Rule 4 Report addressing onset) that "[P]etitioner's multiple comorbidities – including osteoarthritis of the left shoulder make it difficult to distinguish whether and to what extent [P]etitioner's symptoms were attributable to any alleged vaccine injury." ECF No. 33 at 8, n. 3. However, Respondent does not further develop this argument, or dispute that Petitioner has failed to establish any SIRVA Table requirement raise aside from onset. While I have found that Petitioner has established a Table SIRVA claim, I acknowledge her co-morbidities certainly explain some of her overall severity, and will reasonably impact any damages award. Moreover, based on my preliminary review, Petitioner's shoulder treatment subsequent to July 2019, appears related to her osteoarthritis, rather than in treatment of the SIRVA. Ex. 3 at 87-88 (Dr. Penton on July 29, 2019, recommended Petitioner consult with Dr. Matthew Williams "to discuss the role of primary shoulder replacement in the face of her significant osteoarthritis" after a July 2019 MRI showed significant osteoarthritis); Ex. 3 at 93 (Dr. Williams observed at an August 15, 2019 appointment that Petitioner states she was "diagnosed with frozen shoulder in the past after a flu shot, which has been resolved.").

ECF No. 39 at 8, FN 5.

Respondent argues that Petitioner's shoulder treatment after July 2019 was not related to her SIRVA, but instead reflected non-SIRVA-caused osteoarthritis. Respondent asserts that Petitioner's clinical picture was fairly consistent from February to June 2019, during which time she treated for symptoms attributed to frozen shoulder. ECF No. 55 at 7. But Petitioner's range of motion was improved in June and July 2019 (at which time it was found to be normal), despite an increase in her reported pain in July 2019. *Id.* (citing Ex. 3 at 83-84, 88). By August 2019, despite Petitioner reporting that her "frozen shoulder was 'in the past' and 'ha[d] been resolved'," Petitioner's range of motion was again reduced. *Id.* (citing Ex. 3 at 93-94). Respondent argues that it follows Petitioner's continued symptomology was attributable to her osteoarthritis rather than her SIRVA – pointing to her July 2019 MRI demonstrating glenohumeral arthritis (Ex. 3 at 52), Dr. Penton's July 29, 2019 observation of "significant glenohumeral osteoarthritis" after reviewing Petitioner's July 2019 MRI (Ex. 3 at 88), and Dr. Williams's post operative diagnosis on September 11, 2019 of "Grade 4 articular cartilage degenerative change" (Ex. 3 at 138). ECF No. 55 at 7-8. Finally, Respondent argues that there is no evidence that Petitioner's vaccination was caused or aggravated by her vaccination. *Id.* at 8-10.

## IV. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, sworn statements, filings, and all assertions made by the parties in written documents or briefs and at the expedited hearing held on September 25, 2026.[6] I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

As a preliminary matter, I observe that prior to her vaccination, Petitioner suffered some significant comorbidities, including lumbar radiculopathy, left wrist carpal tunnel syndrome, left hand neuropathy, fibromyalgia, and chronic pain among other ailments. *See* Ex. 1; Ex. 2 at 5-18.

Petitioner (then 63 years old) received the flu vaccine on November 5, 2018. Ex.

[6] However, for the purpose of brevity I do not address all medical records, sworn statements, medical literature, other filings, and arguments put forth by the parties.

1 at 1.[7] A factor immediately relevant to my damages determination is that Petitioner did not report or seek medical guidance for her subsequent shoulder pain until February 27, 2019 – 114 days, or nearly four months after her vaccination. While Petitioner provided a credible explanation for her delay in seeking treatment in as discussed in my Ruling on Entitlement, nonetheless her delay supports a finding that her shoulder pain most likely was not so severe as to necessitate immediate treatment post-vaccination.

Subsequently, and as the parties generally agree,[8] Petitioner's treatment through July 2019 was likely related to her SIRVA. Petitioner's treatment during this time included multiple appointments with her primary care provider (Ex. 2 at 24, 27) and orthopedist, Judson, Penton, MD (Ex. 3 at 73, 83, 87), as well as two MRI reports (Ex. 6 at 109-10, Ex. 3 at 52-53), two steroid injections (Ex. 3 at 75-76), and a prescription nonsteroidal anti-inflammatory drug (Ex. 3 at 75, 154).

Beginning in June and July 2019, as Respondent points out, the focus of Petitioner's shoulder treatment changed. While Petitioner's range of motion had been seen to have been reduced in April 2019 (Ex. 3 at 75), it was found to be normal in June and July 2019 (*Id.* at 84, 88). Despite this, Petitioner reported to Dr. Penton in June that her shoulder pain condition had "worsened." *Id.* at 83. Dr. Penton observed that while Petitioner's "was doing much better from her adhesive capsulitis standpoint" having regained full range of motion, "she continues to have significant pain with forward elevation and lifting." *Id.* at 84. He, therefore, ordered "a repeat MRI to evaluate her rotator cuff." *Id.* The MRI Impression, following an exam on July 17, 2019, included: "Glenohumeral osteoarthritis[9] with diffuse high-grade cartilage loss and moderate

---

[7] As I observed in my Ruling on Entitlement:

> Petitioner's sworn statements, and at least one contemporaneous treatment record references a vaccination date of November 6, 2018, the vaccine administration records document that the flu vaccine was administered on November 5, 2018. Ex. 1; Ex. 2 at 24; Ex. 7; Ex. 8 at 20; Ex. 9; Ex. 10. However, I don't find that it is necessary to resolve the exact date of vaccination to find whether onset occurred within 48 hours of Petitioner's vaccination.

ECF No. 39 at 1, fn 4.

[8] I acknowledge that Respondent disputed Petitioner's entitlement to compensation arguing that Petitioner failed to establish the onset of her shoulder pain within 48 hours of her vaccination, as required to establish a SIRVA Table claim. ECF No. 33. However, this was the only SIRVA requirement Respondent disputed, and I found that Petitioner has established the onset of her SIRVA pain occurred within 48 hours of her vaccination, notwithstanding her delay reporting her shoulder pain. ECF No. 39.

[9] Osteoarthritis is defined as "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." Dorland's Medical Dictionary Online (hereinafter "Dorland's"),

reactive marrow edema of the humeral head;" in addition to "[r]eactive joint effusion with prominent debris and synovitis," "[t]race subacromial – subdeltoid bursitis" and "[n]o rotator cuff tear or muscular atrophy." Ex. 3 at 52-53. At her follow-up appointment with Dr. Penton in July 2019, Dr. Penton reviewed Petitioner's MRI and observed that she had "significant glenohumeral arthritis," and that while she had "developed significant stiffness" she has an "intact rotator cuff." *Id.* at 88. Dr. Penton observed that before "pursuing any further injections" he wanted Petitioner seen by "Dr. Matthew Williams to discuss the role of primary shoulder replacement in the face of her significant osteoarthritis." *Id.*

On August 15, 2019, Petitioner was seen by Matthew Williams, MD. Petitioner reported that "she was diagnosed with frozen shoulder in the past after a flu shot, which has been resolved." Ex. 3 at 93. After examination, Dr. Williams found that Petitioner suffered "left shoulder pain with decreased range of motion. She reports a normal shoulder prior to a flu shot after which she had frozen shoulder which has been appropriately treated. She has persistent pain and decreased range of motion actively and passively." *Id.* at 94. Dr. Williams discussed with Petitioner the option of undergoing a "total shoulder arthroplasty versus capsular release. Despite her bony edema in the MRI, my recommendation . . . would be a shoulder arthroscopy with debridement and lysis of adhesions to try and increase her motion." *Id.* Finally, Dr. Williams stated that if that procedure "fails to improve her mobility or decrease her pain significantly" Petitioner could proceed with a shoulder arthroplasty. *Id.* Petitioner opted to proceed with the least invasive procedure initially, a left shoulder arthroscopy with capsular release. *Id.*

On September 11, 2019, Petitioner underwent surgery involving two arthroscopic procedures: 1) "Left shoulder arthroscopy;" and 2) "Left shoulder arthroscopic large glenohumeral joint debridement of the glenohumeral joint, the articular cartilage over the glenohumeral head, labral fraying and subdeltoid debridement of bursitis." Ex. 3 at 137-38. Dr. Williams met with Petitioner one week after her surgery, at which point they had a "long [d]iscussion regarding her shoulder" and "reviewed the images" – Dr. Williams impression was "[a]dvanced arthritis" that would "require [a] total shoulder arthroplasty." Ex. 3 at 100.

Petitioner ultimately underwent a left shoulder total arthroplasty and left shoulder open distal clavicle excision on January 6, 2020. Ex. 3 at 139-140. Subsequently, Petitioner continued to be followed by Dr. Williams and engaged in post-surgical physical therapy through April 2020. Ex. 3 at 131, Ex. 4 at 2.

---

*Osteoarthritis*, https://www.dorlandsonline.com/dorland/definition?id=35780&searchterm=osteoarthritis (last visited October 19, 2026).

In making my determination, I have also fully considered Petitioner's sworn supplemental statement dated July 21, 2020. Ex. 9. Petitioner therein discusses that prior to her vaccination, she "suffered, and continue[s] to suffer with fibromyalgia. However, I had no prior problems with pain or stiffness in my left shoulder." Ex. 9 at 1.

Despite Respondent's contentions that Petitioner's SRVA had resolved after July 2019, and my preliminary finding that Petitioner's shoulder treatment subsequent to July 2019, appeared more related to her osteoarthritis, a more complete review of the record establishes that Petitioner's shoulder treatment through at least her first surgery was *at least partially related to her SIRVA*. I acknowledge that Petitioner's treating providers appeared to believe that her post-vaccination SIRVA related diagnoses had resolved in the summer of 2019, and attributed her ongoing shoulder issues to osteoarthritis. Ex. 3 at 84 (Penton observed in June 2019 that Petitioner "was doing much better from her adhesive capsulitis standpoint"); *Id.* at 88 (Dr. Penton referring Petitioner to Dr. Williams in July 2019 "to discuss the role of primary shoulder replacement in the face of her significant osteoarthritis"); *Id.* at 94 (Dr. Williams August 2019 "impression" that Petitioner "reports a normal shoulder prior to a flu shot after which she had frozen shoulder which has been appropriately treated. She has persistent pain and decreased range of motion . . .).

However, I have long recognized that "in the vast majority of SIRVA claims where petitioners undergo an MRI of the affected shoulder, there is evidence of degenerative symptoms of the shoulder, especially in certain specific age groups of the population." *Werning v. Sec'y of Health & Human Servs*., No.18-0267V, 2020 WL 5051154, at *11 (Fed. Cl. Spec. Mstr. July 27, 2020). This overlapping of conditions makes it difficult to separate what treatment relates to the SIRVA from what relates to the underlying comorbidity – here degenerative findings and ultimately osteoarthritis. Ex. 3 at 52-53; Ex. 6 at 109-10. In this case Petitioner's shoulder treatment through her first surgery closely follows her vaccination - the September 2019 surgery occurred approximately ten months after her November vaccination, and only six and a-half months after she first commenced treatment at the end of February 2019.

Additionally, Petitioner's March and July 2019 MRI reports documented findings of subacromial subdeltoid bursitis (Ex. 3 at 52-53, Ex. 6 at 109-10) – a common finding in SIRVA claims, and an injury recognized by the 2024 NASEM Report as having a causal relationship with vaccine administration. National Academies of Science, Engineering, and Medicine, *Evidence Review of the Adverse Effects of COVID 19 Vaccination and Intramuscular Vaccine Administration*, 172-175 (2024). Moreover, the surgical report following Petitioner's first shoulder surgery on September 11, 2019, also detailed findings

of subdeltoid bursitis. Ex. 3 at 137-138.[10] While Respondent correctly pointed out at the hearing in this claim that bursitis can be caused by conditions aside from SIRVA (including osteoarthritis), I have found that Petitioner suffered a Table SIRVA as a result of her November 2018 vaccination, and therefore it is likely that her bursitis findings on MRI in March and July 2019, as well as at her September 2019 surgery, are (at least partially) related to her SIRVA. However, Petitioner's bursitis appears to have been fully addressed (resected) during her September 2019 surgical procedure. Ex. 3 at 138. Moreover, Petitioner's January 2020 surgical report contains no findings of bursitis. Ex. 3 at 139-140.

Accordingly, Petitioner's subsequent treatment appears most likely related exclusively to her degenerative arthritis - not her SIRVA. Petitioner's vaccination could not have caused, or significantly aggravated, osteoarthritis – a degenerative condition that better explains the complete shoulder replacement she underwent in January 2020. Ex. 3 at 139-140. While Petitioner's March 2019 MRI report did not document or making a finding of "osteoarthritis" (as her July 2019 MRI report did), the March report clearly documented degenerative findings similar to those found in the July report, and addressed by Petitioner's subsequent surgeries. ECF No. 55 at 9-10 (discussing the MRI Reports). Further, Respondent is correct in pointing out that Petitioner's submitted literature fails to establish that the flu vaccination, or SIRVA, can cause or lead to osteoarthritis or degenerative arthritis. ECF No. 55 at 8-10 (discussing the medical literature submitted by Petitioner at exhibits 11-13). Petitioner's degenerative arthritis was most likely a comorbid condition which existed alongside Petitioner's other comorbidities (including her fibromyalgia, and for a time, her SIRVA).

In sum, I find that Petitioner suffered a moderately severe SIRVA, the symptoms of which overlapped with her most likely age-related osteoarthritis or degenerative arthritis, but was significantly resolved following her September 11, 2019 surgical procedures approximately ten months post-vaccination. Petitioner's subsequent shoulder treatment, including her January 2020 surgery and follow-up treatment, is unrelated, and therefore cannot be included in assessing damages.

Petitioner argued in her brief, and at the hearing in this case, that she should be awarded $180,000.00 in pain and suffering compensation (representing compensation for all of her left shoulder related treatment) relying upon two cases: *Mavin v. Sec'y of Health & Hum. Servs.,* No. 20-1591V, 2024 WL 5386543 (Fed. Cl. Spec. Mstr. Dec. 9, 2024) (awarding $175,000.00 in pain and suffering) and *Pruitt v. Sec'y of Health & Hum. Servs.,* No. 17-0757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (Special

[10] Dr. Williams's surgical reports states "I then placed the arthroscope in the subacromial space. There was significant subdeltoid bursal tissue and bursitis. I resected it." Ex. 3 at 138. Dr. Williams's post-operative diagnoses included both "Grade 4 articular cartilage degenerative change" and "Subdeltoid bursitis." *Id.*

Masters Sanders awarding $185,000.00 in pain and suffering in a SIRVA claim). However, I find that the petitioners in these cases suffered more severe SIRVA injuries, and did not delay treatment of their injury, or experience multiple co-morbidities like Petitioner herein.

In contrast, Respondent argues Petitioner should be awarded only $30,000.00 in pain and suffering compensation (representing compensation for left shoulder related treatment through July 2019) relying upon the following cases: *Hiatt v. Sec'y of Health & Hum. Servs.*, No. 23-1560V, 2025 WL 1542314 (Fed. Cl. Spec. Mstr. May 13, 2025) (awarding $25,000.00 in pain and suffering), *Turnquest v. Sec'y of Health & Hum. Servs.,* No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024) (awarding $30,000.00 in pain and suffering), *Valdez v. Sec'y of Health & Hum. Servs.,* No. 21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (awarding $35,000.00 in pain and suffering). However, these cases represent SIRVA injuries significantly less severe than I have found Petitioner's SIRVA – and none of these cases involve a surgical procedure.

I find that the best comparable case is one offered by *neither* party – *Vaccaro v. Sec'y of Health & Hum. Servs.,* No. 19-1883V, 2022 WL 662550 (Fed. Cl. Feb. 2, 2022) (awarding $110,000.00 in pain and suffering). The petitioner in *Vaccaro* initially delayed seeking treatment for her SIRVA, underwent a surgical procedure, and received a steroid injection to treat her injury. While Petitioner herein received two steroid injections, I observe that she did not engage in physical therapy,[11] while Ms. Vaccaro did. Additionally, Petitioner's symptoms persisted a little longer than Ms. Vaccaro's symptoms (which I found continued for nearly eight months while I have found Petitioner's SIRVA symptoms resolved approximately ten months following her vaccination), however Petitioner herein suffered a number of co-morbidities which I did not observe in the *Vacarro* claim.

Accordingly, **$110,000.00 represents a fair and appropriate amount of compensation for Petitioner's past or actual pain and suffering.**

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $110,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering, and $660.56 a fair and appropriate award for Petitioner's unreimbursed expenses.[12]**

---

[11] I have found that Petitioner's second surgery and subsequent treatment (which includes her physical therapy following the second surgery) are not related to her SIRVA.

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $110,660.56 (representing $110,000.00 for pain and suffering and $660.56 for unreimbursed expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.